GERALD D. ROSEN & another[1] vs. A-H, INC.

Suffolk.    September 13, 1983. — November 23, 1983.

Present: GRANT, KAPLAN, & DREBEN, JJ.

*Contract*, Construction.  *Evidence*, Extrinsic affecting writing.  *Debt*.
  *Subordination*.

In an action to establish the priority of claims of unsecured trade creditors
  of a corporation over the indebtedness represented by a convertible
  debenture issued by the corporation, the judge did not err in consider-
  ing extrinsic evidence to explain certain ambiguous provisions of a
  clause in the debenture qualifying the priority given to trade creditors.
  [127-129]
Where a subordination clause in a debenture contained a clear statement
  giving priority to the claims of trade creditors over those of the holder
  of the debenture, as well as certain provisions limiting the priority of
  trade creditors which were difficult to reconcile with the clear subor-
  dination of debt, and where evidence showed that the purpose of the
  subordination clause was to enable the corporation issuing the deben-
  ture to obtain short term financing from trade creditors despite its lack
  of equity, this court construed the subordination clause as giving
  priority to the claims of trade creditors.  [129-130]

CIVIL ACTION commenced in the Superior Court on
December 26, 1976.

The case was heard by *Hurd, J.*

*Carl K. King* (*Eric I. Zucker* with him) for the defend-
ant.

*Gerald P. Tishler* (*John A. Wortmann, Jr.*, with him) for
the plaintiffs.

DREBEN, J.   This appeal turns on the construction of a
subordination clause in a 1973 convertible debenture issued
by Austin Hastings Co., Inc. (the Company), to the defend-
ant, A-H, Inc.  A judge of the Superior Court held that the

---

[1] Henry Gesmer.

defendant's claim to the proceeds of a foreclosure sale was subordinated to the claims of unsecured trade creditors represented by the plaintiffs. We affirm.

The 1973 debenture was issued in exchange for an earlier debenture of the Company, given to the defendant in partial payment for the purchase by the Company of the defendant's assets. The debenture matured in July, 1976, and its "payment and performance" were secured by the Company's equipment. After the debenture came due and the Company was unable to meet its obligation, the defendant foreclosed. Because of claims made by representatives of the trade creditors (the plaintiffs), the proceeds of the sale ($204,221.72) were held in escrow pending the outcome of this action. The amount so held is insufficient to pay either the principal and interest due on the debenture or the sums stipulated to be owing the trade creditors ($787,838.20).

The clause in question, § 9 of the debenture, is set out in the margin.[2] Under the first portion, § 9.1, the defendant

---

[2] "9. *Subordination.*

"9.1. The Company covenants and agrees and the Holder hereof likewise covenants and agrees that the indebtedness represented by this Debenture and the payment of the principal hereof, and premium, if any, interest and mandatory prepayments hereon shall be subordinate to all indebtedness of the Company to The National Shawmut Bank of Boston or any other bank indebtedness including that of banks taking the position of, or participating with, said National Shawmut Bank of Boston and to trade creditors for goods sold and delivered and services rendered (herein "Senior Debt") to the end that no payment shall be made by the Company on account of the principal of, or premium, if any, or interest on this Debenture, or as a mandatory prepayment of this Debenture, and this Debenture shall not be purchased either directly or indirectly by the Company as long as any Senior Debt is outstanding; provided, however, the Company may on the stated maturity dates make payments on account of the principal of or premium, if any, or interest on this Debenture, or as a mandatory prepayment of this Debenture, or may either directly or indirectly purchase this Debenture on its stated maturity dates (if this Debenture is declared due and payable by reason of the acceleration hereof, any such event shall not be deemed a stated maturity date), or as an optional prepayment of this Debenture as provided in Section 2.2 hereof [*sic*], but only if, the Company obtains the written consent of The National Shawmut Bank of Boston in respect of prepayments under said Sec-

as holder agreed that "the indebtedness represented by this Debenture" and the payment of principal and interest "shall be subordinate . . . to trade creditors for goods sold and delivered and services rendered ('Senior Debt') to the end that no payment shall be made by the Company on account of the principal . . . or interest . . ., as long as any Senior Debt is outstanding."

If the clause had there ended, the rights of the parties would be beyond question; the plaintiffs would be entitled to the proceeds of the sale. An additional proviso in § 9.1, together with § 9.2, has, however, led the parties to divergent conclusions.[3]

The inartful language of § 9 and the varied interpretations which can be and have been placed on it refute the defendant's contention that there was error "in the admission

---

tion 2.2 at any time while the Company is indebted to The National Shawmut Bank of Boston.

"9.2. Nothing contained in this Section 9 shall limit or restrict the right of the Holder hereof to realize upon the security interests and liens which the Holder hereof has perfected under and pursuant to the Pledge Agreement, Security Agreement, and Guaranty as security for all payments due hereunder, said security interests and liens hereby being recognized as prior liens to any claim or rights of any creditor of the Company, except as specifically permitted under said documents and the Purchase Agreement."

[3] The defendant argues that the proviso in § 9.1 which permits the Company to make payment "on the stated maturity dates" means that payments are only subordinated prior to maturity, but that there is no subordination thereafter. It claims that that even if it is wrong in this interpretation, it is entitled to the proceeds of the security by reason of § 9.2, as that clause means that only its claims in excess of its security interest are subordinated by § 9.1 to the trade creditors.

The plaintiffs insist that the defendant's construction of the proviso would nullify the subordination clause since only at maturity would significant payments become due. Moreover, although the proviso permits the Company to make certain limited principal payments, it does not, on the plaintiffs' reading, give the defendant the right to enforce payment while senior debt is outstanding. As to § 9.2, the plaintiffs argue that the term "realize" means only that the defendant had the right to take possession and sell subject to the rights of the senior creditors. Otherwise § 9.1 would be rendered nugatory; the importance of priorities only arises when the debtor's assets are insufficient to meet its debts.

of evidence of the facts and circumstances of the transaction
. . . for the purpose of . . . explaining any uncertainty or am-
biguity . . . ." *Robert Indus., Inc.* v. *Spence,* 362 Mass.
751, 753 (1973). Restatement (Second) of Contracts § 212,
and comment b (1981).

Evidence at trial indicated that the method of financing
the Company's purchase of the defendant's assets left the
Company without any equity. The purpose of the subor-
dination clause was to induce suppliers to extend credit to
the Company. Without it, such credit would not have been
forthcoming.[4] The proviso, relied upon by the defendant,
permits certain payments by the Company. It does not pur-
port to nullify at maturity the priority given to trade
creditors in § 9.1, and no evidence suggests that such an in-
terpretation was ever contemplated by the parties.[5] Read-
ing the proviso in light of its purpose to enable the Company
to obtain short-term financing from trade creditors despite
the lack of equity shown on its balance sheet, we conclude
that the payments permitted by the clause were not intend-
ed to eliminate the plaintiffs' senior status.[6]

---

[4] The need for current financing is a well recognized purpose of subor-
dinated securities. "[S]ince these issues [subordinated securities] are
regarded by senior debt holders as equity capital rather than debt, they
furnish an equity base" which enables the issuing corporation to obtain
short-term financing. Calligar, Subordination Agreements, 70 Yale. L.J.
376 (1961).

[5] In fact, the evidence is consistent with a contrary conclusion. Each
year the financial statements of the Company, which under the provisions
of the debenture were required to be given promptly to the defendant, ex-
plicitly stated that the debenture was subordinated to trade creditors.
None of the annual statements, not even the statement next prior to the
debenture's maturity, suggested that the subordination rights of the trade
creditors ended on maturity.

[6] We also note that the proviso did not well suit the transaction. Al-
though § 9.1 speaks of maturity dates, there appears to be only one
maturity date in the instrument. The only mandatory prepayment called
for is in § 2.1 which requires a payment of 25% of the original principal
amount "on the fourth anniversary of the date of issuance hereof." That
date came after maturity, as the date of issue was February 16, 1973, and
the date of maturity was July 30, 1976.

We also decline to adopt the defendant's reading of § 9.2 so as to limit the priority of the trade creditors in § 9.1 to the defendant's unsecured claims. The equitable considerations underlying the rule that an assignment of debt usually carries with it all liens and security, see 3 Williston, Contracts § 432A (3d ed. 1960), are applicable here. Where there is a clear subordination of debt as in § 9.1, we will not deny that provision its practical effect in the absence of specific language that priority in the security is not intended. Subordination agreements are "consistently" construed to afford substantial "practical" benefits to the debt or security interest given priority. *Grise* v. *White*, 355 Mass. 698, 704 (1969).

Such consistent construction might lead us, with some plausibility, to accept the plaintiffs' interpretation of § 9.2, see note 3, *supra*. An alternative and perhaps more satisfactory solution is to recognize, as did the trial judge, that the language of § 9.2 cannot be readily reconciled with § 9.1. Where as here the "main object to be accomplished is stated in [§ 9.1]," and where "a repugnancy is found between [two clauses, § 9.1 and § 9.2,] the one which essentially requires something to be done to effect the general purpose of the contract itself is entitled to greater consideration than the other which tends to defeat a full performance, and repugnant words may be rejected in favor of a construction which makes effectual the evident purpose of the entire instrument." *Morrill & Whiton Constr. Co.* v. *Boston*, 186 Mass. 217, 220 (1904). With this precept in mind, we give greater weight to § 9.1 than to § 9.2 and read the latter as meaning that the security interests of the defendant are recognized as prior to claims of creditors except as specifically permitted under certain specified documents and except as provided by § 9.1 of the debenture. Accordingly, we hold that the plaintiffs are entitled to priority in the proceeds.

*Judgment affirmed.*